## COMMONWEALTH vs. JOHN GOMES MENDES.

Plymouth. February 6, 2004. - April 16, 2004.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Evidence,* Prior misconduct, Subsequent misconduct, Hearsay, State of mind, Motive, Relevancy and materiality, Credibility of witness. *Practice, Criminal,* Argument by prosecutor, Instructions to jury, Voir dire, Polling of jury, Capital case. *Homicide. Witness,* Credibility. *Malice. Jury and Jurors.*

At the trial of an indictment for murder in the first degree, a Superior Court judge properly admitted evidence of the defendant's use of cocaine and association with prostitutes [464] and evidence of the hostile relationship between the defendant and his wife [464-465] to show that he had a motive to kill his wife, rather than as improper propensity evidence.

Evidence at the trial of an indictment for murder in the first degree, consisting of a hearsay statement reflecting the victim's state of mind [465], a witness's testimony regarding the deterioration of the defendant's relationship with the victim [465], and a note that the victim left for the defendant stating her plan to move out [465-466], was admissible as relevant to the defendant's motive to kill the victim.

At the trial of an indictment for murder in the first degree, evidence concerning the defendant's spending habits and his relationship with his son after his wife's death was probative of his motive to kill his wife. [466-467]

Statements a criminal defendant made to two women in conjunction with his admissions to killing his wife and threats to kill the two women were designed to intimidate the women and impress them with the seriousness of his threats, and thus were relevant as intending to emphasize the veracity of his admissions. [467]

Evidence at the trial of an indictment for murder in the first degree concerning the defendant's wife's second pregnancy was admissible to establish the defendant's motive to kill his wife, and its relevance far outweighed any potential it might have had to arouse juror sympathy. [467-468]

This court concluded that testimony admitted in evidence at the trial of an indictment for murder in the first degree concerning the defendant's unemployment before and during his marriage to the victim and the manner in which the defendant took control of the victim's car was not offered for improper purposes, but rather as support for the Commonwealth's theory that the defendant viewed the victim's inheritance as a solution to his lack of income. [468-469]

Prosecutorial questioning of a witness on redirect examination at the trial of an indictment for murder in the first degree was a proper means of rehabilitating the witness on topics elicited during cross-examination [469];

likewise, the prosecutor's questions during redirect examination of other witnesses regarding their feelings about testifying were permissible to negate the suggestion of bias raised on cross-examination of those witnesses [469-470].

At a murder trial, no error resulted from an inadmissible hearsay response a witness gave in response to questioning, where the judge gave an appropriate curative instruction, struck the answer from the record, and told the jury to disregard it [470]; further, a statement by the victim's mother was admissible as an adoptive admission [470-471], and the victim's statement to her sister reporting an instance when the defendant physically abused her, as well as other statements the victim made concerning her marriage to the defendant and his treatment of her, were relevant to show the victim's state of mind toward the defendant shortly before she was murdered [471-472].

Evidence of a witness's fear of the defendant was relevant to the circumstances of the defendant's admission to the witness that he had killed his wife. [472]

The prosecutor's opening statement and closing argument at the trial of an indictment for murder in the first degree did not evidence prosecutorial misconduct, where the challenged statements were based on evidence and were fair and obvious comments about the source of the victim's inheritance and the defendant's not wanting a second child [472], and where the arguments depicting the murder and supporting the theory of extreme atrocity or cruelty were based on the evidence or reasonable inferences that could be drawn from the evidence [473], and assertions that the victim could no longer tolerate the defendant's infidelities and cocaine use were supported by properly admitted evidence [473].

No substantial likelihood of a miscarriage of justice was created at a murder trial by a jury instruction on credibility [474]; further, the judge's instructions to the jury adequately explained the purposes of opening and closing statements of counsel [474-475] and properly instructed the jury regarding the third prong of malice for the purpose of extreme atrocity or cruelty [475-476].

A criminal defendant failed to demonstrate prejudice resulting from defense counsel's exclusion from a conversation between a deliberating juror and a judge at the trial of an indictment for murder in the first degree. [476-477]

The judge at the trial of an indictment for murder in the first degree did not abuse her discretion in declining to inquire into potential juror bias, where the information communicated by the juror did not amount to a serious question of possible prejudice. [477-478]

INDICTMENT found and returned in the Superior Court Department on March 19, 1999.

The case was tried before *Linda E. Giles*, J.

*Stephanie M. Glennon* (*Kevin J. Reddington* with her) for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of the July 29, 1986, murder of his wife on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal he makes numerous assertions of error concerning the admission of evidence, prosecutorial misconduct in the opening statement and closing argument, jury instructions, and matters concerning the jury themselves. He also asks us to exercise our power under G. L. c. 278, § 33E, to reduce the conviction or order a new trial. We affirm the conviction and decline to exercise our power under § 33E.

1. *Background.* On March 25, 1984, when she was sixteen years old, Susan Lawton lost both parents in an automobile accident. Until the estates were settled in late July, 1986, she received advances on her inheritance of $150,000. At the time her parents died, Susan was dating the defendant, who was then twenty years old. At the age of seventeen, she moved in with the defendant and became pregnant. At the age of eighteen, after giving birth to their son, Susan married the defendant. She became pregnant with their second child shortly thereafter. The defendant claimed that the second child was not his.

Susan was happy to have a family and to be carrying her second child. She wanted to buy a two-family house and furniture, but the defendant was not interested. The defendant preferred spending his wife's inheritance on cocaine and consorting with prostitutes, regular indulgences that were a subject of frequent arguments between them. He seldom worked and made very little money during the sporadic times that he was employed. His unemployment benefits were exhausted in April, 1986. Concerned that her inheritance was being depleted, Susan began to limit the defendant's access to her assets, causing further friction between them. He tried to assert control over her money several times, demanding access to her inheritance both from her and the attorney for her parents' estates. In early July, 1986, Susan said to the defendant, "My father worked too long and too hard for you to be doing all his hard earned money up your nose." In late July, Susan and the defendant argued about money on three occasions in the presence of others. Approximately one week before she was murdered, Susan confronted the defendant about his infidelity. He denied cheating on her.

On July 28, 1986, Susan planned to visit a friend. The defendant told her he would take the baby and a friend to buy a carpet and would pick her up at her friend's house by 10 P.M. Instead, he and his friend used cocaine and drank liquor that the defendant purchased at a liquor store. Susan told her friend that, while she put up with much from the defendant, she could not tolerate his infidelity. Because the defendant did not pick her up until just before 2 A.M., Susan was extremely upset and the two argued immediately on his arrival. On returning home, Susan took the baby upstairs and remained there while the defendant left to take his friend home. She left a note on the kitchen table that said, "I'm going to move out tonight."

Sometime between 3 and 3:30 A.M., a neighbor heard a woman's muffled screams, immediately followed by a baby's cry. At 4 A.M. the defendant arrived at a friend's house in Brockton, appearing nervous and tense. At 5:30 A.M. he went to the home of Annette Eddy, a woman with whom he had been having a sexual relationship. He appeared wet and sweaty. He told Eddy that his wife had locked him out and that he needed a place to sleep. She did not allow him to sleep in her bed but said that he could sleep in the living room. He was gone when she awoke in the morning.

A neighbor who lived in the same building as Susan and the defendant noticed (on his way to and from work) the defendant's car parked on the street in front of the apartment building at 6:30 A.M. and at 12 P.M. on July 29. At about 2 P.M. another neighbor saw the defendant enter the house. About one minute later she heard screams. When the neighbor telephoned the defendant, he explained that his wife had been raped. The police arrived shortly thereafter, and the defendant told an officer that his wife was two months pregnant, that he had left the house at 12:30 A.M., stayed with friends, and came home to find his wife dead. While conducting the investigation of the scene, the police eliminated the possibility of a break-in. The defendant's explanation as to his whereabouts at the time of the murder could not be corroborated. The defendant telephoned Eddy and told her that, if anyone should ask, she should say that he spent the night at her house.

Based on the testimony of the Commonwealth's pathologist,

Susan Mendes probably died between 3 and 4 A.M. on July 29, 1986, from asphyxiation by manual strangulation. There were no drugs or alcohol in her system and there was no evidence of sexual assault, although her naked body was found hanging off her bed. In addition to the injuries caused by strangulation, she sustained other injuries while still alive. Her lips were scraped by blunt force consistent with that of a hand being forced over her mouth. Her left eye showed signs of hemorrhaging due to blunt trauma caused by a hand or a smooth-edged object. There were two contusions near her temples and one on the top of her forehead, also caused by blunt injury. She had scratches behind her left ear. A depression in the wall in the bedroom sixty to sixty-three inches above the floor was consistent with an impression made by the head of a person of the victim's height. There was fresh plaster on the floor below the depression.

Within a few years of Susan's death, the defendant spent all of her inheritance, leaving him with no assets. He also paid little or no attention to his son, whom his mother was then raising, and he contributed no money to the support of the child.

The defendant was not indicted for Mendes's murder until thirteen years later, after two individuals came forward and told the police that the defendant admitted to the murder. One of the individuals, Mary Peters, explained that, while she had been dating the defendant a few months after Susan's death, he took her to a cemetery, pointed to a headstone, and told her to be good or "he would put [her] where he put his wife." He said he had killed his wife and could kill her, adding that he was involved in the "Cape Verdean mafia." Similarly, ten years after the murder, Vicki Harris, a neighbor, told the police that she had been confronted by the defendant who told her to "get the fuck away from his property because he'd take care of [her] like he did his first wife."

2. *Evidentiary issues.* The defendant copiously cites instances of what he characterizes as prosecutorial misconduct in the introduction of evidence. We note that generally a prosecutor cannot be criticized for the introduction and use of evidence that has been admitted, even if the judge's rulings on the admission of such evidence are ultimately determined to be erroneous. See *Commonwealth* v. *Woods*, 427 Mass. 169, 173 n.5 (1998).

We will therefore address the defendant's allegations of "prosecutorial misconduct" as questions of judicial error, unless the question requires a different analysis.

The defendant's claims of error fall into several categories: the admission of evidence of (a) prior bad acts and bad character; (b) subsequent bad acts and bad character; (c) prejudicial evidence and invocations of sympathy; and (d) hearsay and state of mind evidence.

(a) *Prior bad acts and bad character.* The defendant asserts several errors in the admission of evidence involving his use of cocaine and his association with prostitutes. The defendant correctly recites that "the prosecution may not introduce evidence of a defendant's prior or subsequent bad acts for the purpose of demonstrating bad character or propensity to commit the crime charged." *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994). However, such evidence may be admissible, if relevant, for other purposes, including proof of motive. *Id.* at 793-794, and cases cited.

The defendant's use of cocaine and association with prostitutes was not offered as improper propensity evidence, but to show that he had a motive to kill his wife. The defendant's drug use had escalated in the months before the murder, prompting him to demand more money from Susan's inheritance. Arguments over money escalated in frequency and intensity. In the weeks before the murder, when she refused to give the defendant any money, the defendant's dealer allowed him to purchase cocaine on credit. When the defendant failed to pay him, the dealer refused to sell him any more drugs. The only way the defendant, who was frequently unemployed, could sustain his lifestyle was to gain unfettered access to his wife's inheritance. The evidence concerning the defendant's lifestyle was relevant to his motive to kill Susan. "Evidence of motive is generally admissible." *Commonwealth* v. *Conkey*, 430 Mass. 139, 145 (1999). "Without the challenged evidence [the murder] could have appeared to the jury as an essentially inexplicable act of violence." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1982).

Evidence of the hostile relationship between the defendant and his wife was not offered as improper propensity evidence,

as the defendant contends, but also as evidence of his motive to kill her. See *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 127 (2000). The defendant's friend, James Scott, testified to arguments he witnessed between Susan and the defendant about his excessive cocaine purchases. Similarly, one of the couple's neighbors overheard the defendant demanding that Susan give him more money. During one argument Susan said that she had given him five hundred dollars and would not give him any more. Another neighbor witnessed a similar argument where Susan complained to the defendant about his excessive spending. A few weeks before the murder, Susan told the defendant, "My father worked too long and too hard for you to be doing all his hard earned money up your nose." In the week before the murder, she confronted the defendant about his extramarital activities. There was no error.

The defendant argues that the judge erroneously admitted a hearsay statement witnessed by one of his friends, who testified that Susan "said she was going to be in control of the money," because the defendant "was spending too much." This was not offered as evidence of bad character, but as evidence of Susan's state of mind as to *her intention* to exercise sole control over her inheritance, which had been communicated to the defendant and was relevant to his motive to kill. As such, it was admissible. See *Commonwealth* v. *Cruz*, 424 Mass. 207, 212 (1997).

Similarly, the defendant challenges a former classmate's opinion that the defendant was living off his wife's money, stating that he "would *imagine* hookers" were one source of the defendant's expenditures. There is no suggestion that the witness was not testifying except from personal knowledge. His use of the word "imagine" was merely a colloquialism. The defendant's history of spending his wife's money on drugs and prostitutes, along with the evidence of the couple's arguments over financial issues, was not offered as evidence of bad character, but as evidence concerning the deterioration of their relationship. It was relevant to the defendant's motive to kill his wife.

The defendant also objected to the admission of the note that Susan left for him ("I'm going to move out tonight") in the

early hours of July 29. The note, which police found on the kitchen table, was relevant to Susan's state of mind and the defendant's motive to kill her. Her intention to move out would effectively cut off the supply of money he had relied on to support his cocaine habit and his pursuit of prostitutes. Although the Commonwealth was required to show that the defendant had read the note, see *Commonwealth v. Cyr*, 433 Mass. 617, 625 (2001), quoting P.J. Liacos, Massachusetts Evidence § 8.2. 2, at 468 (7th ed. 1999) ("Statements of a victim of a crime made prior to the event may be admissible in order to prove a motive or relevant state of mind of the defendant, if there is evidence they were communicated to the defendant"), the jury could infer that he had read it. Earlier that night Susan had told a friend, Mary McMorrow, that she would never tolerate the defendant's infidelity. She also had had a heated argument with the defendant at McMorrow's apartment. The jury could infer that she confronted the defendant about the same matter she had mentioned to McMorrow, and then left the note on the kitchen table where he would see it when he returned home after dropping off a friend. See *Commonwealth v. Borodine*, 371 Mass. 1, 8-9 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth v. Williams*, 30 Mass. App. Ct. 543, 547-548 (1991). Even if the defendant had not read the note, it was a minor piece of evidence that was essentially cumulative of other considerable evidence that their relationship had deteriorated badly. As such, it was not prejudicial.

(b) *Subsequent bad acts and bad character.* The defendant challenges the admission of evidence concerning his spending habits and his relationship with his son *after* Susan's death. Evidence of the defendant's spending habits after the murder was admissible because it was probative of his mental state at the time of the murder. See *Commonwealth v. Cardarelli*, 433 Mass. 427, 434 (2001), and cases cited. Before his wife's death, he would spend approximately forty dollars for each cocaine purchase, but after her death, he was spending two hundred dollars a purchase. After her death, he began to purchase "flashy clothes" and cars. He wore formal clothes, carried a brief case, and spent large sums of money. The evidence of his spending habits after Susan's death was probative of his motive to kill

her: she stood between him and the money he needed to sustain the lifestyle he desired. Once he had control of her inheritance, he was able to pursue that lifestyle freely.

The defendant also spent very little time with his son before the victim's death, and he became even more disinterested afterward. Despite the defendant's promise to put $25,000 aside for their son after Susan's death, he had not spent "one dime" on the child, forcing the defendant's mother to resort to government assistance to raise him on her own. The defendant challenges as hearsay the evidence of his promise to provide for his son. It was not hearsay, but a statement the defendant made to police, and admissible as the statement of a party opponent. *Commonwealth* v. *Marshall*, 434 Mass. 355, 365 (2001), quoting P.J. Liacos, *supra* at 496. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957). It was relevant to show that he wanted his wife's entire inheritance for himself, and that he looked on his familial responsibilities only as a way to conceal his true intentions for the use of the money.

The defendant also challenges the admission of two statements he made to Vicki Harris and Mary Peters after the murder. The statements included a potentially racial or sexist slur to Harris during the course of an argument, and a statement to Peters to the effect that he was in the "Cape Verdean mafia." Both statements were made in conjunction with his admissions to killing his wife and threats to kill the two women. Together with his admissions, the statements were designed to intimidate the women and impress on them that his threats were to be taken seriously. As such, they were relevant as part of his admissions, intended to emphasize their veracity.

(c) *Prejudicial evidence and invocations of sympathy.* The defendant makes numerous claims of error concerning the admission of testimony that he claims was intended solely to appeal to juror sympathy and paint him as a bad character. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 831 (1996). Relevant evidence is not rendered inadmissible by its potential to arouse feelings of sympathy in a jury. The evidence remains admissible if its probative value outweighs its potential for sympathy. Cf. *Commonwealth* v. *Santiago*, 425 Mass. 491, 496-497 n.4 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S.

1003 (1998). The judge permitted the prosecutor to introduce evidence concerning the second pregnancy, over objection. Susan's second pregnancy marked a change in the couple's relationship. It prompted her desire to move into a nicer home and buy better furniture. The defendant did not want to make such purchases, but Susan was adamant. The defendant even denied being the father of the second child. The evidence concerning the second pregnancy was not offered solely to garner sympathy for Susan or cast the defendant in a bad light. It was relevant to the defendant's state of mind and his relationship with his wife, both of which went to establish his motive · to kill. The evidence was relevant because it tended to show that the defendant had no intention of sharing the inheritance with his son, the unborn child, or his wife. Its relevance to the defendant's motive far outweighed any potential the evidence might have to arouse juror sympathy. The evidence was admissible, and the prosecutor did not exploit that potential.

The defendant next challenges Susan's sister's testimony that he was unemployed at the time of his son's birth, that the wedding was paid for by Susan, and that he did not buy her an engagement ring. The defendant also challenges the testimony of Patricia Mish, a relative with whom Susan lived after her parents died, to the effect that Mish did "believe" that the defendant was not working at the time of the marriage. The challenged evidence was not offered for improper purposes, but as support for the Commonwealth's theory that the defendant viewed the inheritance as a solution to his lack of income. The jury could infer that he encouraged Susan to move out of Mish's home and to live with him because Mish stood in his way.

There is no merit to the defendant's contention that Mish's testimony about how he took control of Susan's new car unfairly portrayed him as a scoundrel. Mish had encouraged Susan to buy a new car with an advance from the estate. After Susan bought a car, the defendant appropriated it for his own purposes, leaving her without the use of a vehicle. When Mish intervened and demanded that Susan keep the car, the defendant became angry and yelled at Mish. Susan went to live with the defendant shortly thereafter. The defendant objected to the prosecutor's question to Mish concerning whether she approved of the

defendant's taking over the car. At the time, Mish had been act-
ing somewhat as a surrogate parent, and the defendant's
response to Mish's encouragement that Susan exercise indepen-
dence from him was relevant to show that he had other plans
and desired to obtain Susan's inheritance even before they were
married.

The defendant also challenges the prosecutor's question to
Susan's sister, Theresa Gorman, concerning whether she initially
believed the news of Susan's death, and if she knew that an
autopsy would be performed. The prosecutor's questions came
on redirect examination, in response to defense counsel's sug-
gestion on cross-examination that Gorman was indifferent to the
news of Susan's death, in contrast to the defendant's concern
for the victim. The question about her initial reaction to the
news allowed the witness to explain that she was unsure whether
to believe the source of the information, who was otherwise not
reliable. A witness may properly explain on redirect examina-
tion her testimony elicited on cross-examination. See *Com-
monwealth* v. *Degro*, 432 Mass. 319, 323 (2000). The question
concerning whether she knew if an autopsy was to be conducted
allowed Gorman to explain that, when she knew her sister had
in fact died and an autopsy would be performed, a hospital visit
was unnecessary. The prosecutor's rehabilitation of the witness
was proper.

The defendant refers in two footnotes to what he describes as
several instances of improper questions designed to elicit
sympathy.[1] The defendant challenges the prosecutor's questions
during his redirect examination of Annette Eddy, Vicki Harris,
and Mary Peters regarding their feelings about testifying. On
several occasions, the defendant attempted to impeach these
witnesses by suggesting bias against him based on past romantic
or contentious relations with him, and further suggesting that
their testimony was concocted to incriminate him. To counter
defense counsel's suggestions, the prosecutor asked the wit-

---

[1] In the same footnote, the defendant argues that the prosecutor asked a wit-
ness if her son had died from a medical problem, solely to elicit sympathy.
Because it was likely that the son was a percipient witness and therefore
expected to testify, this question had the purpose of explaining his absence to
the jury. See *Commonwealth* v. *Auguste*, 418 Mass. 643, 647-648 (1994)
(relevance of questions regarding witness's failure to testify).

nesses to explain how they felt about testifying, and if they had testified voluntarily. *Commonwealth* v. *Marrero*, 427 Mass. 65, 69 (1998) (prosecutor entitled to rehabilitate witness after defendant implied bias on cross-examination). When Eddy was asked how she felt about her son's being called to testify at the grand jury proceeding she responded, "I was upset because I've been very reluctant to get involved," and when asked about how she felt when she received a subpoena to appear she said, "I was very upset . . . ." Similarly, when asked if she had particular feelings about testifying at trial and whether she wanted to testify, Harris said, "No, I [did not] want to be bothered with it." The questions elicited testimony indicating that the witnesses were anything but enthusiastic about testifying, an appropriate response to the suggestion made during cross-examination. The judge sustained the defendant's objection when the prosecutor asked Peters a similar question, so there was no evidence concerning her feelings about testifying.

Again, in two footnotes, without argument or reference to case law, the defendant alleges there were several instances where the prosecutor improperly bolstered the character of six Commonwealth witnesses with evidence of their character for truthfulness. The prosecutor pursued no such strategy. Rather, he was rehabilitating the witnesses with evidence of prior consistent statements.

(d) *Hearsay and state of mind evidence.* The defendant contests a question posed by the prosecutor to Vicki Harris that led to a response containing inadmissible hearsay. When asked, "You say to the defendant a statement, is that correct?," Harris responded, "I made a point to make it known [to the defendant] that I knew what had happened [to Susan] because [the defendant's second wife] had told me what he had done before." The judge sustained the defendant's objection, struck the answer from the record, and told the jury to disregard it. The defendant requested no further relief. There is no error because the judge gave an appropriate curative instruction and the jury are presumed to follow her instruction. See *Commonwealth* v. *Barros*, 425 Mass. 572, 580 (1997), and cases cited.

The defendant objected to the admission of a statement made by his mother to Theresa Gorman on the afternoon after the

murder. Specifically, Gorman had rushed over to the defendant's mother's house to inquire about the circumstances of Susan's death. In the presence of the defendant, his mother told Gorman that the defendant had gone out the night of her death. This statement was admissible as an adoptive admission. See *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705 (2000).

The defendant argues that the judge erroneously admitted a prejudicial hearsay statement made by Susan to her sister reporting an instance when the defendant physically abused her. On cross-examination, the defendant had asked Gorman whether it was fair to say that she had never heard that the defendant had struck Susan. Gorman responded that that was "not fair to say." On redirect examination and without objection, the prosecutor inquired about Gorman's response to defense counsel's question. Gorman said, "She told me that there was an incident where he was rough with her. He was throwing her around in the bedroom and she got scared. He threw her on the floor and she pretended she was unconscious." Having opened the door to this evidence, defense counsel understandably did not object, and reasonably may have concluded that it would have been better to let the jury hear about the single prior episode of domestic abuse than have them speculate as to what Gorman meant by her testimony on cross-examination.

The defendant argues that the judge erroneously admitted statements, over his objection, made by Susan including (1) a statement to her sister a few weeks before the murder indicating that she "was stuck at home by herself"; (2) a statement to Gorman the evening of the murder that she was pregnant and that she was upset with the defendant because "he was late picking her up"; and (3) a statement made to her friend Mary McMorrow the evening of the murder that her marriage was "difficult, that she would put up with a lot but if he were ever cheating on her, she would never tolerate it." These statements were all relevant to show Susan's state of mind toward the defendant shortly before she was murdered. See *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997), *S.C.*, 440 Mass. 576 (2003). Contrary to the defendant's contention, there was ample evidence to indicate that his wife communicated her state of mind to him in the weeks, days, and hours before the murder.

The evidence of communication included witness testimony about their mounting battles over money and his cocaine abuse, and her question to him about whether he was being unfaithful to her. It also included evidence of the argument they had at McMorrow's apartment shortly before Susan was murdered. The jury could infer that during that argument Susan confronted the defendant with the same matter she had discussed with Mc-Morrow just a few hours earlier, his infidelity. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 8-9 (1976). The evidence of Susan's state of mind was relevant to the defendant's motive to kill her.

The defendant contests the admission of testimony by Mary Peters that she feared the defendant. As discussed above, evidence of Peters's fear was relevant to the circumstances of the defendant's admission to her that he had killed his wife. Peters's fear, resulting from the defendant's threatening statements, was evidence that his efforts to intimidate her were successful. Her state of mind was relevant to the context in which his admission to killing his wife had been made.

There is no merit to other claims of error in the admission of evidence.

3. *Prosecutor's opening statement and closing argument.* The defendant complains of prosecutorial misconduct in the opening statement and closing argument. The defendant challenges the prosecutor's opening remarks that the victim had had to "grow up fast" and that the defendant did not want a second child. The prosecutor made a similar statement in his closing argument. The statements were based on evidence and were fair and obvious comments about Susan's loss of her parents when she was only sixteen years old, explaining how she came to possess a substantial sum of money at an early age. The comment about the unwanted child was based on the evidence that the defendant denied being the unborn child's father. The defendant also challenges the prosecutor's use of the term "blood money" when characterizing the inheritance. The term "blood money" was a fair comment on the overwhelming evidence of the defendant's motive to kill, and the prosecutor's use of the term three times was not so heavy handed as to constitute unfair exploitation of the material.

The defendant challenges portions of the prosecutor's argument used to support the theory that the murder had been committed with extreme atrocity or cruelty. The prosecutor had suggested that (1) there was a struggle during the murder; (2) Susan was awake; (3) the baby was awake; (4) Susan's "heart [was] crying out for more blood" as the defendant strangled and muffled her cries by "sticking her face in the mattress"; (5) she heard the baby crying; and (6) the defendant exposed his wife's naked body and positioned it to suggest rape. Contrary to the defendant's assertion, these statements were supported by the evidence.

The pathologist reported that Susan sustained several injuries as a result of blunt force while she was still alive, conscious, and struggling to breathe. The police reported the body was found naked, except for a ripped shirt around her neck, with her upper body on the bed and her legs hanging off the side. A witness heard two muffled screams, as if a hand or pillow covered the woman's mouth, followed almost immediately by a baby's cry. The prosecutor's depiction of the murder was based on the evidence or reasonable inferences that could be drawn from the evidence. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990). Although the argument about positioning the body to suggest rape had no relevance to the theory of extreme atrocity or cruelty, it was a fair comment on the evidence and relevant to the identity of the defendant as the murderer, where, even before the police arrived, the defendant tried to divert attention from himself by telling a neighbor that his wife had been raped.

The defendant also challenges the prosecutor's assertions that Susan was aware of and would no longer tolerate the defendant's infidelities and cocaine use. Properly admitted evidence of the defendant's history with drugs and prostitutes, the couple's frequent and heated arguments about the defendant's lifestyle, Susan's suspicion of infidelity and confrontation of the defendant with her suspicions, together with her statement "that she would put up with a lot but if he were ever cheating on her, she would never tolerate it," support the prosecutor's argument that she was fed up with his behavior.

4. *Jury instructions.* (a) *Instruction concerning character.*[2]
The defendant argues that the judge's instruction that permitted
the jury to consider a witness's "character" when assessing
credibility was erroneous. There was no objection. In *Com-
monwealth* v. *Daley*, 439 Mass. 558, 565-566 & n.3 (2003), we
criticized the use of the term "character" when instructing on
credibility, and recommended against its use. The judge did not
have the benefit of that decision, which was released after the
trial of this case. The instruction did not create a substantial
likelihood of a miscarriage of justice because the judge did not
identify any particular witness when discussing the use of
character, and the jury were specifically instructed not to
consider the defendant's "acts" or "bad character" as evidence
of his guilt. *Id.*

(b) *Instruction regarding use of opening and closing
statements.* The defendant argues that the judge failed to
adequately explain how the jury may treat the opening and clos-
ing statements of counsel, and that the instruction that such
statements were "not a substitute for the evidence" allowed the
jurors to use the arguments to "augment[]" the evidence. The
judge's instruction adequately explained the purposes of the
statements of counsel. In her preliminary instructions, the judge
explained, "After the opening statements about the view and
the regular opening statements, then the Commonwealth will
begin to introduce evidence . . . . After all the evidence, each
side will have an opportunity to address you in what we call
closing arguments. But like the opening statements, those clos-
ing arguments are not a substitute for the evidence. They are
merely intended to help you understand the respective conten-
tions of the parties." No reasonable juror would interpret this
instruction to mean that the opening and closing statements
could be considered evidence or to be "augmenting" evidence.
See *Commonwealth* v. *Berrio*, 43 Mass. App. Ct. 836, 838
(1997) (judge not required to use any particular words as long

---

[2]The defendant also challenges "the trial judge's instruction to the jury to
convict upon the Commonwealth's 'evidence, from whatever source,' " sug-
gesting that such would allow the jury to ignore any limiting instructions.
There was no error because the judge preceded this phrase, which was part of
the "presumption of innocence" language, with the limiting instructions on
how certain types of evidence were to be considered.

as full and accurate explanation of law given).[3] There was no error.

(c) *Manslaughter instruction.* Defense counsel objected to the judge's refusal to give a manslaughter instruction. The evidence did not warrant a manslaughter instruction. There was no evidence of provocation, and the defendant claimed total innocence and alibi. See *Commonwealth* v. *Sirois*, 437 Mass. 845, 855 (2002) (no error where focus was on self-defense, not provocation). There was no error.

(d) *Malice instruction.* The defendant argues that, although he failed to object at trial, the judge erroneously instructed the jury as to the third prong of malice for the purpose of extreme atrocity or cruelty by stating that an intent to cause grievous bodily harm sufficed to establish malice.

The judge instructed the jury that, with respect to extreme atrocity or cruelty, "[m]alice, in this context, includes, one, an intent to cause death, or two, an intent to cause grievous bodily harm. With respect to these two ways, the Commonwealth must prove that the defendant actually intended to cause the death of the deceased or intended to cause the deceased grievous bodily harm. Malice, for purposes of this theory of murder, also includes, three, an intent to do an act, which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." This is a correct statement of the law. See *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995).

The defendant contends that because the alleged manual strangulation did not include a gun or other deadly weapon it was not the kind of risk, that is, likelihood of death, that could lead to a finding of malice. See *Commonwealth* v. *Sires*, 413

---

[3]In a footnote, the defendant also argues that the jurors may have thought they could consider the opening and closing statements as evidence because the judge had informed them that they could consider as evidence "any facts which the lawyers have agreed to," rather than using the term "stipulated." The judge was not required to use any particular words, see *Commonwealth* v. *Berrio*, 43 Mass. App. Ct. 836, 838 (1997), and when the judge read the stipulation she said, "[T]he parties have entered into a stipulation, or an agreement, as to certain matters . . . . [T]his is evidence in the case just like the testimony and the physical exhibits in the case." Such an explanation clearly informed the jurors about stipulated facts, and reasonably could not be interpreted as referring to opening and closing remarks.

Mass. 292, 303 n.14 (1992) ("The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death"). There was no error. Death by prolonged and forceful strangulation, as here, constitutes a plain and strong likelihood of death. See *Commonwealth* v. *Caines*, 41 Mass. App. Ct. 812, 817 (1996).

5. *Jury issues.* (a) *Denial of challenges for cause.* The defendant argues that the judge improperly refused to excuse a prospective juror for cause, compelling defense counsel to expend a peremptory challenge to remove him. The defendant had not exhausted his peremptory challenges when the jury were empanelled, so there was no error. See *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 445 (2001) (error occurs if defendant exhausted all peremptory challenges and forced to accept undesired juror).

(b) *Judge's conference with a deliberating juror.* Before the beginning of the second day of deliberations, a juror asked a court officer if he could speak with the judge alone. The judge asked both parties if they objected if she spoke with the juror alone. The parties agreed, on condition that the judge disclose everything she learned. The judge agreed, and stated that she would notify the juror of her obligation to share what she learned with the parties.

After conversing with the juror, who indicated he would only speak with the judge in confidence, the judge agreed to honor that confidence. The judge later reported to the parties, "I told [the juror] that I was going to share this conversation and at first he was unhappy about that, but then — and indicated that it was a matter of life or death. I started thinking this must be a matter of threats. No, it evolved into something a lot less scary. Apparently, he is in disagreement with another member of the jury. He feels that another member of the jury is biased, apparently, because of his occupation. . . . I said, 'I cannot hear anything about your deliberative process. It's sacrosanct. It's like the confession,' but the — after a number of questions to him, I am satisfied that what is going on here is that he is in disagreement with one of his fellow jurors." Finding that the matter involved no extraneous influence, and after satisfying herself that the juror being questioned could continue with

deliberations, the judge told the juror to return to the jury room. She then discussed the matter with counsel and impounded the transcript of her conversation with the juror. The judge denied counsel's request to inquire into any bias based on race or matters unrelated to the evidence presented at trial.

The defendant first argues that, because defense counsel was excluded from the conversation and denied access to the transcript, he was unable to determine whether the juror's issue involved prejudice against the defendant. The defendant, however, agreed to the private conversation between the judge and the juror and therefore cannot now claim that he was harmed by his exclusion. More problematic is the judge's failure to share a transcript of the conversation with the parties at the time. However, the parties have since been granted access to that transcript, and there is no claim that the judge did not fairly and accurately report the substance of her conversation with the juror. The defendant has not shown that not having the transcript at the time deprived him of the opportunity to raise other issues.

The defendant next claims that the judge should have inquired into potential juror bias. "When a judge determines that the jury may have been exposed during the course of trial to material that 'goes beyond the record and *raises a serious question of possible prejudice,*' he should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). We review the judge's decision for abuse of discretion. *Id.* at 799.

The judge did not abuse her discretion by declining to conduct a further inquiry of the jury. Here, the juror told the judge that he thought another juror was compromised based on the other juror's statement that "his job is a problem for him." The concerned juror told the judge that he was prompted to notify the judge of this perceived bias of another juror because "my conscience says I have to bring this up to somebody." The juror said, "I put it together, and I say to myself, this is a compromised person. He is not making a judgment according to anything other than his job." The information communicated by the juror did not amount to a "serious question of possible

prejudice." It was nothing more than speculation by one juror about another juror's thought process. The judge did not abuse her discretion in refusing to inquire further or conduct a voir dire of the other jurors. *Commonwealth* v. *Francis, supra* at 370. Contrast *Commonwealth* v. *Laguer,* 410 Mass. 89, 94-99 (1991) (in context of motion for postconviction relief, where there was evidence that one juror made specific assertions of ethnic bias against defendant during deliberations, defendant's right to fair trial required further inquiry by judge).

(c) *Request for jury polling.* Defense counsel's request for jury polling was made after the jury were dismissed, and therefore not timely. See *Commonwealth* v. *Reaves,* 434 Mass. 383, 395 (2001). Further, "[t]he decision to poll the jurors is within the trial judge's discretion." *Commonwealth* v. *Wilson,* 427 Mass. 336, 356 (1998). The defendant has not shown an abuse of that discretion.

6. *Relief under G. L. c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the entire record, and decline to reduce the conviction or to order a new trial.

*Judgment affirmed.*