NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13112

COMMONWEALTH  vs.  WES DOUGHTY.


Essex.     January 9, 2023. - May 2, 2023.

Present:  Budd, C.J., Lowy, Kafker, Wendlandt, & Georges, JJ.


Homicide.  Practice, Criminal, Mistrial, Argument by prosecutor,
    Instructions to jury, Jury and jurors, Conduct of juror,
    Indictment, Capital case.  Mental Impairment.
    Intoxication.  Jury and Jurors.  Burning a Dwelling House.
    Attempt.  Jurisdiction, Superior Court.  Superior Court,
    Jurisdiction.



    Indictments found and returned in the Superior Court
Department on May 9, 2017.

    The cases were tried before Timothy Q. Feeley, J.


    Jeffrey L. Baler for the defendant.
    Kathryn L. Janssen, Assistant District Attorney, for the
Commonwealth.


    WENDLANDT, J.  The defendant, Wes Doughty, was convicted on

two counts of murder in the first degree in connection with the

February 2017 killings of Mark Greenlaw and Jennifer O'Connor

inside a Peabody home.  The defendant admitted to killing

Greenlaw, whom he shot in the face at close range; however, he contended that the killing was committed in a heat of passion stemming from Greenlaw's treatment of David Moise, a "crack" cocaine dealer who was wheelchair-bound and who also lived in the Peabody residence. He also admitted to killing O'Connor, whom he stabbed and slashed more than twenty times as she pleaded for her life, asked to see her father, and gasped futilely for breath; but the defendant contended that he had been under the influence of crack cocaine. The jury convicted the defendant of murder in the first degree on the theory of premeditation as to both victims, and on the theory of extreme atrocity or cruelty as to O'Connor.[1]

On appeal, the defendant maintains that the trial judge abused his discretion in denying his motion for mistrial, that the prosecutor's closing argument was improper, that the jury instructions were erroneous, that a juror should have been dismissed, and that the attempted arson indictment was defective. He also asks this court to exercise its authority under G. L. c. 278, § 33E, to reduce the degree of guilt or

---

[1] He was also convicted of one count of attempted burning of a dwelling, in violation of G. L. c. 266, § 5A; one count of armed carjacking, in violation of G. L. c. 265, § 21A; one count of kidnapping, in violation of G. L. c. 265, § 26; and one count of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A (b).

order a new trial.  We affirm the convictions and discern no reason to grant relief under G. L. c. 278, § 33E.

1.  <u>Background</u>.  a.  <u>Facts</u>.  The following facts are supported by the evidence presented at trial.

The events leading to the killings took place in the Peabody home from which Moise ran his drug distribution operation.  Shortly before the killings, Greenlaw moved into the home.  Greenlaw assisted Moise in his drug-selling enterprise, gradually replacing Michael Hebb, who, along with his girlfriend, Christine Cummisky, also resided in the home.

The defendant was one of Moise's regular buyers; he came to the home daily to use cocaine and also to help care for Moise, whom he called "Dad."  On the afternoon of the killings, Cummisky heard Hebb and the defendant discussing Greenlaw in the second-floor bedroom.  Both men were angry.[2]

Hebb complained that Greenlaw was "moving in" on Moise's drug dealing business and was adamant that he "wasn't letting it happen."  The defendant disapproved of the care Greenlaw provided to Moise, who required assistance in eating and

---

[2] Disagreements among the residents began after Greenlaw began spending more time at the house; a week before the killings, Greenlaw slapped Hebb, giving him a black eye, and Hebb later responded by discharging a rifle into the garage when he believed Greenlaw was inside.  Cummisky suspected that Hebb knew she had twice been intimate with Greenlaw.  Hebb also may have owed Greenlaw money.

toileting.  The defendant and Hebb discussed "doing something" to Greenlaw.  The defendant told Hebb, "When you see me standing in this spot, you know shit is about to happen," referring to a spot between two lion figures in front of the house.

Soon thereafter, Cummisky saw the defendant standing in the agreed spot, and she notified Hebb, who had gone to the second-floor bathroom to shower.  The defendant reentered the home and went upstairs into the bedroom; he was holding a revolver.  Cummisky heard the first-floor bathroom door open, and the defendant ran downstairs; Hebb stayed upstairs with Cummisky.

Cummisky heard the defendant and Greenlaw arguing, and then she heard gunshots.  The medical examiner later opined that Greenlaw was killed by a close-range shotgun blast between his eyes.[3]

Cummisky next heard a woman -- presumably O'Connor, who was engaged to Greenlaw -- scream, "[O]h, my God.  What did you do?" and plead with Greenlaw to "wake up."[4]  Cummisky then heard O'Connor say, "[P]lease just let me leave.  I just want to go

---

[3] Police officers eventually recovered a shotgun in a marsh or wood through which the defendant and Hebb had fled, see infra; it was capable of firing the type of shot that killed Greenlaw and contained a live round.  Officers also recovered a rifle, a shotgun, and a revolver in the basement of the Peabody house, but none of these was likely the murder weapon.

[4] Hebb went downstairs and then returned a few minutes later.

see my dad," and, "If you're going to rape me, kill me first," followed by whimpering.[5]  The medical examiner testified that O'Connor was stabbed and sliced twenty times, including twice on her torso, with one stab wound penetrating her left lung and one penetrating to her spine.  She had at least a dozen wounds in her neck; her jugular vein was severed, and her carotid artery was cut.[6]  The medical examiner testified that the hemorrhaging from the wounds on her torso indicated that they likely were inflicted after the stab wounds in the neck.  As she was dying from blood loss, she would have tried to breathe faster and deeper, but the injury to her left lung would have interfered with her ability to do so.  Most likely, she did not die instantaneously, but rather over the course of minutes.

When the defendant returned upstairs, he was shirtless and covered in blood.  Hebb went downstairs and returned with a shotgun or rifle wrapped in a pair of jeans.  Hebb also carried Moise, who was crying, upstairs.  Cummisky heard banging

---

[5] Forensic evidence later determined that O'Connor was killed on Moise's bed, which was located on the first floor, but on the other side of the house from where Greenlaw had been killed; her blood was found on the bedframe, floor, and walls. The defendant was very likely a minor contributor to deoxyribonucleic acid found under O'Connor's nails.

[6] Two knives stained with human blood were later recovered from the basement:  a folding knife and a serrated single-edge saw-type knife.

downstairs and asked Hebb whether the defendant had shot Greenlaw; Hebb confirmed that the defendant had done so.

The next day, the defendant ordered Cummisky to clean blood off the kitchen cabinets, which Cummisky did.[7]  The defendant followed her as she cleaned.  By this point, the crack cocaine supply in the house had been depleted; Hebb and the defendant called a supplier to deliver more.  When the supplier arrived, he noticed the kitchen and living room had been cleaned; the defendant was carrying a shotgun and looked "strange."

The defendant and Hebb then spent time in the basement; they told Cummisky to bang on the stairs if anyone pulled into the driveway.  While the defendant and Hebb were in the basement, Cummisky fled from the home, without shoes or a coat despite the winter conditions.  Cummisky waved down a driver in a passing vehicle and dove into the vehicle headfirst, screaming that "[t]hey just killed two people."  The driver took Cummisky to the police station, where Cummisky reported the killings.  A marked police cruiser established a loose perimeter at the home.

Early the following morning, a former buyer of the drug distribution business arrived at the home; all the lights were off.  The buyer observed that the defendant was "high as a

---

[7] Cummisky had asked Hebb whether the defendant planned to kill her; Hebb responded that the defendant did not, but Hebb warned Cummisky not to "act crazy in front of him."

kite," and she saw him do "a couple of hits" of crack cocaine. The defendant, whom the buyer described as "a strange person," "an idiot," "always off," "a weird dude," and "always a little different," was "acting even stranger than he usually did." The defendant pointed a rifle or shotgun at the buyer's face and asked repeatedly whether law enforcement officials were outside. After the defendant escorted the buyer from the home, the buyer sent Hebb a text message informing him of the presence of a police cruiser on the street outside the house.

The defendant and Hebb fled from the home in a van before a special weapons and tactics team entered the home. In the basement, the law enforcement officials found gasoline containers and a welding torch hose threaded down the bulkhead leading to two rolled up rugs; inside the rugs were the victims' bodies, wrapped in cellophane and placed in body bags. The officers also found a bloody mattress, garbage bags, and a disassembled shotgun or rifle. The welding torch hose was connected to an acetylene tank filled with flammable gas.[8] The rugs and garbage bags were covered in flammable liquid; inside the bags were blood-soaked clothing and bedding, along with a pocket knife. The kitchen smelled strongly of cleaning products.

---

[8] The defendant had experience with welding.

When the van in which the defendant and Hebb had fled broke down, Hebb called a friend to pick them up. When the friend arrived, Hebb emerged from the woods wearing a mechanic's outfit, followed several minutes later by the defendant. Both were soaking wet.

Later, the defendant arrived alone at the Middleton home of one of his childhood friends; the defendant was wet and apparently cold. The defendant said, "I'm in some trouble. I've got -- it was them or me. I've got a couple of bodies." The defendant made a gesture as if he were handling a rifle. The friend declined to help him, and the defendant stole a car from the property and fled.

A few days later, the defendant entered Kenneth Metz's car and forced him into the passenger's seat at knifepoint, tying him up with a seatbelt and driving to various locations. The defendant twice mentioned "the Farm Ave. killing,"[9] apparently assuming Metz had seen news coverage of it. Metz testified that the defendant said he had been "really angry because the other people there had been giving medical-grade heroin to a relative or his godfather and he didn't want his godfather getting addicted to heroin." The defendant told Metz that he "went in without any weapons but used whatever was in the house." He

---

[9] The Peabody home where the killings occurred was on Farm Avenue.

also stated, "I've killed one person now.  It won't matter too much if I have to kill another one."  Metz managed to escape, and he later reported to the police that the defendant stated he had killed "these people."  Metz also stated that he "knew pretty quick this guy wasn't altogether" and that the defendant's "attitude was fluctuating."  The defendant drove Metz's car to South Carolina, where he was apprehended a few days later.[10]

On his return trip to Massachusetts, police officers found the defendant to be "odd."  On the drive to the airport, the defendant asked to see the officers' cell phones to view media coverage of the killings.  The defendant asked one officer whether he was tired and offered to drive, which the officer found "[e]xtremely weird."  The defendant also commented that he had "made great time" driving down to South Carolina and pointed out landmarks, behavior which the officer found "odd."  The defendant assigned nicknames to the officers.  He asked the officers if they were right- or left-handed and commented that he needed to lace his boots tight in case he needed to run.  At the airport, the defendant shook his handcuffs, drawing attention to himself, behavior which the officers also found "odd."  On the airplane, the defendant tried to speak with other

---

[10] Hebb was apprehended in Peabody; he pleaded guilty to accessory after the fact and attempted burning of a dwelling.

passengers, stating to a passenger with a crucifix, "I'm evil."
He also asked an officer whether he would "let [the defendant]
go" if the plane crashed into the ocean.  Again, the officer
found these statements "bizarre" and "[v]ery strange."

b.  Procedural history.  The defendant was indicted in
May 2017 on two counts of murder in the first degree, in
violation of G. L. c. 265, § 1; one count of rape, in violation
of G. L. c. 265, § 22 (b);[11] one count of attempted burning of a
dwelling, in violation of G. L. c. 266, § 5A; one count of armed
carjacking, in violation of G. L. c. 265, § 21A; one count of
kidnapping, in violation of G. L. c. 265, § 26; and one count of
assault and battery by means of a dangerous weapon, in violation
of G. L. c. 265, § 15A (b).  A jury trial was held in
September 2019.[12]

The jury found the defendant guilty of murder in the first
degree on the theory of deliberate premeditation as to the
killing of both Greenlaw and O'Connor, and also on the theory of
extreme atrocity or cruelty as to O'Connor.  The defendant was
sentenced to two consecutive life sentences without parole for

---

[11] As discussed infra, a nolle prosequi was entered on the
rape charge.

[12] At the start of jury selection, defense counsel raised
the issue whether to ask about sexual assault during voir dire;
the judge did not add the proposed questions, explaining that
the inquiry could bring to the attention of the jury a question
about which there would potentially be no evidence.

the two counts of murder in the first degree.[13]  He filed a timely notice of appeal.

2.  Discussion.  On appeal, the defendant raises several errors, which we address in turn.

a.  Mistrial.  The defendant maintains that the judge abused his discretion in denying his motion for a mistrial after Cummisky testified to O'Connor's statement, "If you're going to rape me, kill me first."

i.  Testimony regarding victim's fear of rape.  Prior to the trial, a nolle prosequi was entered on the rape charge.[14] The defendant filed a motion to exclude as hearsay certain statements that Cummisky said Hebb had made relating to this charge.  In particular, Cummisky had disclosed that, following Greenlaw's killing when Hebb returned upstairs carrying Moise, Hebb had told Cummisky that "[the defendant] is having sex with [O'Connor]" and "his DNA is going to be all in her."  The

---

[13] The jury also found the defendant guilty as to the other charges.  On the count of armed carjacking, the defendant was sentenced to a term of from twelve years to fifteen years, concurrent with the first life sentence, and a $1,000 fine.  On the count of kidnapping, the defendant was sentenced to a term of from eight years to ten years, concurrent with the first life sentence.  On the counts of attempted burning of a dwelling and assault and battery by means of a dangerous weapon, the defendant was sentenced to twenty years' probation each, to run concurrently with one another and the first life sentence.

[14] The indictments were not renumbered; as a result, there was no count three either when the indictments were read aloud or on the verdict slips.

prosecutor consented to the motion and further agreed to exclude evidence that Cummisky heard sounds of sexual intercourse.

On the sixth day of trial, Cummisky testified that after she heard gunshots, she heard a woman screaming[15] and that Hebb went downstairs where the killings occurred and then came back upstairs.  The judge allowed defense counsel's request for a sidebar.  Defense counsel asked whether the prosecutor had instructed Cummisky not to testify as to hearing sounds of sexual intercourse, consistent with the parties' agreement.  The prosecutor asked for a recess during which she reminded Cummisky not to testify regarding the sounds and not to testify as to Hebb's excluded statements.

When Cummisky returned to the witness stand, the prosecutor asked Cummisky whether she continued to hear O'Connor downstairs and what she heard O'Connor say; Cummisky responded that O'Connor said, "Please just let me leave.  I just want to go see my dad."  The prosecutor asked whether she heard O'Connor say "anything else."  Cummisky then testified that she heard O'Connor say, "If you're going to rape me, kill me first."[16]

---

[15] As set forth supra, the woman (presumably O'Connor) screamed, "[O]h, my God.  What did you do?" and pleaded with Greenlaw to "wake up."

[16] The prosecutor continued, asking whether Cummisky had heard O'Connor say "anything else"; Cummisky had not.  Finally, the prosecutor asked whether Cummisky heard screaming or other noises of pain; Cummisky responded that she heard whimpering.

The defendant moved for a mistrial. The prosecutor explained that consistent with the parties' agreement, she had instructed Cummisky not to reference Hebb's excluded statements and the sounds of sexual intercourse. She also represented that, prior to Cummisky's testimony, she had not known that Cummisky had heard O'Connor's statement that O'Connor feared being raped.

The judge credited the prosecutor's explanation and denied the motion. The judge reasoned that Cummisky's testimony regarding O'Connor's statement was different from the excluded evidence related to sexual noises and Hebb's statements. He also explained that the statement did not "suggest that this witness [had] knowledge that, in fact, a rape did or did not occur"; it was "a statement that she heard that is totally consistent with the charges that remain . . . and [did] not disclose to the jury . . . that there [was] any suggestion in the Commonwealth's evidence of a rape."

The judge offered to give a curative instruction and to have the statement struck from the record; defense counsel declined, determining that either option "would draw more attention to the issue." Cummisky's testimony regarding O'Connor's statement was not mentioned again.

ii. Analysis. "The decision whether to declare a mistrial is within the discretion of the trial judge." Commonwealth v.

Bryant, 447 Mass. 494, 503 (2006). This is because the judge is in the best position to determine whether the jury likely would be prejudiced. Commonwealth v. Santiago, 425 Mass. 491, 496 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Thus, our review is limited to determining whether "the judge made a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (quotation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The defendant speculates that the statement, coupled with the gap in the numbered indictments, changed the tenor of the jury's consideration by causing them to believe that rape was the missing charge. He contends that the judge abused his discretion in denying the motion for a mistrial. We disagree.

To begin, O'Connor's statement was relevant to the issue of extreme atrocity or cruelty. Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983) (listing factors to be considered by jury in determining extreme atrocity or cruelty, including "consciousness and degree of suffering of the victim").[17] See Commonwealth v. Witkowski, 487 Mass. 675, 683-684 (2021)

---

[17] After the defendant's trial, we modified the Cunneen factors prospectively. See Commonwealth v. Castillo, 485 Mass. 852, 864-866 (2020).

(victim's "fear and terror" relevant to theory of extreme atrocity or cruelty); Commonwealth v. Rakes, 478 Mass. 22, 44 (2017) (victim's "emotional response" was relevant to theory of extreme atrocity or cruelty).  See also Commonwealth v. Teixeira, 490 Mass. 733, 744 (2022), quoting Commonwealth v. Castillo, 485 Mass. 852, 864 (2020) ("a victim's substantial degree of conscious suffering may support a finding of extreme atrocity or cruelty where it is the reasonably likely consequence of the defendant's actions").[18]

Moreover, the statement, which was a surprise to the prosecutor,[19] was not highlighted; indeed, it was not repeated or otherwise referenced during the entire two-week trial.[20]  On this

---

[18] Contrary to the defendant's contention, the statement, which concerned the victim's fear that she might be raped, was not evidence of a prior bad act used to demonstrate bad character or propensity to commit crime.  See Commonwealth v. McDonagh, 480 Mass. 131, 140-141 (2018) ("evidence of the defendant's other bad acts . . . may be admissible to prove a material issue separate and distinct from the defendant's character or propensity to commit the crime charged").

[19] We defer to the judge's credibility determination.  See Commonwealth v. Jackson, 486 Mass. 763, 780 (2021) ("Given the deference owed trial judges, particularly involving credibility determinations, we cannot conclude that the trial judge abused his discretion here . . .").  "There is nothing in the record to suggest that the [testimony] was planned or even that the prosecutor had any reason to suspect" Cummisky would testify to the statement.  Santiago, 425 Mass. at 496.

[20] For this same reason, we are not persuaded by the defendant's contention that the isolated statement was prejudicial because there was no voir dire regarding sexual offenses during empanelment.  See note 12, supra.

record, there was no abuse of discretion.  See Commonwealth v. Gallagher, 408 Mass. 510, 517-518 (1990) (not abuse of discretion to deny motion for mistrial based on one reference to defendant's incarceration in ten-day trial).  See also Bryant, 447 Mass. at 503-504 (collecting cases in which witness's spontaneous testimony was not so inflammatory as to require mistrial).

b.  Closing arguments.  The defendant contends that the prosecutor's closing argument impermissibly appealed to the jury's sympathy and contained misstatements of the evidence. "In determining whether an argument was improper we examine the remarks in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Teixeira, 490 Mass. at 740, quoting Commonwealth v. Kolenovic, 478 Mass. 189, 199 (2017).

i.  Appeal to sympathy.  The defendant maintains that the prosecutor impermissibly appealed to emotion by stating, " [Greenlaw] and [O'Connor] were human beings.  They were loved. And, despite the battles they were losing at the time of their deaths, they deserved a chance to win the war."

It is well settled that a prosecutor may not appeal to the jury's sympathy.  Commonwealth v. Guy, 454 Mass. 440, 444-445 (2009).  Neither may a prosecutor emphasize "personal characteristics [that] are not relevant to any material issue,"

if such emphasis would "risk[] undermining the rationality and thus the integrity of the jury's verdict" (citation omitted). Commonwealth v. Fernandes, 487 Mass. 770, 791 (2021), cert. denied, 142 S. Ct. 831 (2022) (discussing repeated reference to victim's age as relevant to extreme atrocity or cruelty and concluding that such reference as well as additional characterization of victim as "innocent boy" did not require new trial where jury were instructed that closing arguments are not evidence and that they were to be guided by "[r]eason, logic, [and] common sense" and "not emotion, not sympathy, not sentiment"). A prosecutor may, however, "tell the jury something of the person whose life had been lost in order to humanize the proceedings." Fernandes, supra, quoting Santiago, 425 Mass. at 495.

Here, the prosecutor's statement was not quite the same as a statement that the victim did not "deserve" to die, which we have previously said is improper. Compare Commonwealth v. Gentile, 437 Mass. 569, 580 (2002) ("victim 'didn't deserve to die this way'"). Instead, the statement was a plea that the jury not "write off" the victims (as well as the other occupants of the Peabody home, including the defendant) as unworthy of their attention, a theme to which the prosecutor returned at the end of her argument:

"It would be really easy, ladies and gentlemen, to write off the residence of Farm Ave., to think of it as just that, a parallel universe that has nothing to do with us and that, frankly, the people who enter there deserve what they get.

"Nobody in this case, not [Greenlaw], not [O'Connor], not [the defendant,] not . . . Cummisky or . . . Hebb, nobody grew up thinking that they would end up at Farm Ave. It is not what anyone plans for their life, and nothing about having been at Farm Ave. or having been an addict means that anyone deserved what they got . . . ."

Nonetheless, we agree with the defendant that the statement was not material to any disputed issue, compare Fernandes, 487 Mass. at 791 (references to victim's young age material to extreme atrocity or cruelty), and it bordered on the types of emotional appeals we have discouraged, see Commonwealth v. Lodge, 431 Mass. 461, 470-471 (2000) (statement that victim "was entitled to the right to live and this man took it" improper); Commonwealth v. Barros, 425 Mass. 572, 581 (1997) (statement that victim had "right to live, and these guys, these guys took it away from him" improper). See also Commonwealth v. Torres, 437 Mass. 460, 465 (2002) ("remarks concerning the victims' rights were improper appeals to sympathy"). Although asking the jury not to "write off the residence" as people who "deserve what they get" was permissible humanizing, the prosecutor went further, stating that the victims "deserved a chance to win the war," which was impermissible.

We conclude, however, that the statement, to which no objection was made at trial, did not create a substantial likelihood of a miscarriage of justice. Commonwealth v. Alemany, 488 Mass. 499, 511 (2021) ("Where the defendant did not object at trial, we review for a substantial likelihood of a miscarriage of justice"). The prosecutor did not suggest that the jury base their verdict on sympathy for the victims. Compare Santiago, 425 Mass. at 495 (request for jury to "think about" victim's age and pregnancy improper). The comment was fleeting and made in the context of an otherwise proper closing argument. See Alemany, supra at 512-513 (no substantial miscarriage of justice where improper comments were made during course of otherwise proper closing argument). The judge instructed the jury three times that closing arguments were "not evidence" and that the jurors must decide the case based on the evidence and not on "[e]motion or sympathy." See Fernandes, 487 Mass. at 791 (jury instruction not to be guided by emotions cured any prejudicial effect of prosecutor's improper remark during closing); Commonwealth v. Andre, 484 Mass. 403, 419 (2020) (same). And, as set forth supra, the evidence of the defendant's guilt was overwhelming. See Alemany, supra at 513-514 ("evidence against the defendant was overwhelming"); Commonwealth v. Kent K., 427 Mass. 754, 761 (1998) (appeal to sympathy "troubling" but "less crucial" where guilt was clear).

ii.  Misstatements.  The defendant also contends that the prosecutor's statement that "there is no view of this evidence [that the defendant] didn't take pleasure in the killing of . . . O'Connor"[21] was unsupported by the evidence.

"In closing argument, a prosecutor may not 'misstate the evidence or refer to facts not in evidence.'"  Commonwealth v. Joyner, 467 Mass. 176, 188-189 (2014), quoting Commonwealth v. Lewis, 465 Mass. 119, 129 (2013).  See Mass G. Evid. § 1113(b)(3)(A) (2022).  "However, a prosecutor may argue reasonable inferences from the evidence."  Joyner, supra at 189, quoting Lewis, supra.

The prosecutor's statement, which was relevant to the issue of extreme atrocity or cruelty, was a fair inference from the evidence, inter alia, that the defendant had alternative means of killing O'Connor quickly with the shotgun and instead chose to prolong her death by using a knife; that he brought her away from Greenlaw's body to Moise's bed and there slit her throat; and that he stabbed her additional times while she whimpered and begged for her father in the minutes during which she was bleeding out, gasping for breath, and dying.  See Castillo, 485 Mass. at 865 ("whether the defendant was indifferent to or took

---

[21] The prosecutor later stated, "He took pleasure in that killing.  He killed her slowly in the worst possible way . . . .  And then he took pleasure in the media coverage of it."

pleasure in the suffering of the deceased" is factor upon which jury can make finding of extreme atrocity or cruelty); Cunneen, 389 Mass. at 227.

c. Jury instructions. i. Mental impairment instruction. The judge instructed that, in determining whether the defendant formed the intent to kill required for murder in the first degree under the theory of deliberate premeditation, the jury could consider "any credible evidence that the defendant was affected by his ingestion of drugs." The judge denied the defendant's request to instruct the jury to also consider whether he "suffered from a mental impairment." The judge concluded that "the evidence would not warrant any reasonable jury in drawing inferences that mental impairment may have affected his ability to form the intent with deliberate premeditation to commit murder." That evidence consisted of lay witness testimony that the defendant generally was "odd," "weird," or "strange." One witness testified that, following the killings, the defendant was "even stranger" than usual. Metz observed, also after the killings, that the defendant "wasn't altogether" and exhibited "fluctuating" attitudes. And officers who escorted the defendant back from South Carolina where he had fled also thought the defendant "odd" and described his strange behaviors en route back to the Commonwealth. No evidence linked these observations to the defendant's drug use,

and no evidence tied the drug use to a mental impairment, much less a mental impairment at the time of the killings.

On this record, the judge did not err in denying the defendant's request for a mental impairment instruction. See Commonwealth v. Santiago (No. 2), 485 Mass. 416, 426-427 (2020) ("to be entitled to an instruction on mental impairment, a defendant must, at a minimum, introduce evidence that such an impairment existed at the time of the conduct in question"). Cf. Commonwealth v. Fernandes, 485 Mass. 172, 197 (2020), cert. denied, 141 S. Ct. 1111 (2021) ("Evidence that the defendant consumed alcohol in proximity to the crime[, two to three beers over several hours,] does not itself establish a resulting state of 'debilitating intoxication' such as could support reasonable doubt about the defendant's capability to form the requisite criminal intent"); Commonwealth v. Lennon, 463 Mass. 520, 522-523 (2012) (no impairment instruction warranted where only evidence was that defendant "might have been under the influence of alcohol to some degree about two hours before the stabbing"). Contrast Commonwealth v. Rutkowski, 459 Mass. 794, 796-799 (2011) (mental impairment instruction required based on evidence of defendant's "long history of mental illness," including hospitalizations and diagnoses).

ii. Mitigating circumstances instruction. The defendant next contends that the jury instruction that the defendant's

ingestion of drugs was not a mitigating circumstance that would reduce murder to manslaughter contradicted the instruction that the jury could consider the defendant's voluntary ingestion of drugs as it related to his intent to commit murder. "A trial judge has the duty to state the applicable law clearly and correctly, but is not required to grant a particular instruction so long as the charge, as a whole, adequately covers the issue" (quotations and citations omitted). Teixeira, 490 Mass. at 742. "Trial judges have considerable discretion in framing jury instructions, both in determining the precise phraseology used and the appropriate degree of elaboration" (quotation and citation omitted). Commonwealth v. Kelly, 470 Mass. 682, 688 (2015). "In assessing the sufficiency of the jury instructions, we consider the charge in its entirety, to determine the probable impact, appraised realistically upon the jury's factfinding function" (quotation and alteration omitted). Teixeira, supra, quoting Commonwealth v. Wall, 469 Mass. 652, 670 (2014). "Instructions that convey the proper legal standard, particularly when tracking model jury instructions, are deemed correct." Green, petitioner, 475 Mass. 624, 629 (2016).

The judge properly instructed that the jury "may consider any credible evidence that the defendant was affected by his ingestion of drugs" in deciding whether the defendant acted with

the requisite intent for deliberate premeditation or extreme atrocity or cruelty.[22]

The judge also correctly explained:

"The law recognizes that in certain circumstances which we refer to as mitigating circumstances, a crime is a lesser offense than it would have been in the absence of one or more mitigating circumstances.

"The killing of . . . Greenlaw that would otherwise be murder in the first or second degree is reduced to the lesser offense of voluntary manslaughter i[f] the defendant killed . . . Greenlaw under mitigating circumstances. Not every circumstance you may think [is] mitigating is recognized as mitigating under the law."

See Model Jury Instructions on Homicide 48-49 (2018).

The judge then explained that "voluntary ingestion of drugs is not a mitigating circumstance." This also was a correct statement of the law. Voluntary ingestion of drugs, like mental impairment, is relevant to intent, but it is not a "mitigating circumstance" as that term is used in the law to reduce murder to manslaughter.[23] See Commonwealth v. Johnston, 446 Mass. 555, 559-560 (2006) ("While mental impairment [and voluntary

_____

[22] These instructions were largely taken from the model jury instructions. See Model Jury Instructions on Homicide 47, 54 (2018). See also Commonwealth v. Figueroa, 468 Mass. 204, 222 (2014); Commonwealth v. Mercado, 456 Mass. 198, 207-208 (2010); Commonwealth v. Sires, 413 Mass. 292, 300 (1992).

[23] "Mitigating circumstances" are limited to "heat of passion on a reasonable provocation," "heat of passion induced by sudden combat," and "excessive use of force in self-defense or in defense of another." Model Jury Instructions on Homicide 49 (2018).

intoxication] may be considered . . . on the question whether a defendant formed a specific intent to kill," "a specific intent to cause grievous bodily harm," or "intent to do an act, in circumstances known to the defendant, that a reasonable person would know creates a plain and strong likelihood of death," "it is not a mitigating factor that would reduce murder to manslaughter").

Thereafter, the judge explained that "mitigating circumstances" serve to reduce murder to manslaughter, and then described the particular mitigating circumstances at issue in the case. Viewed as a whole, these instructions "state[d] the applicable law clearly and correctly" such that a reasonable jury could apply the law to the facts; there was no error. Teixeira, 490 Mass. at 742.

iii. Drug use instruction. We agree with the defendant that the judge erred in failing to instruct the jury that they could consider voluntary ingestion of drugs in determining extreme atrocity or cruelty, in addition to considering it in determining intent. See Commonwealth v. Boucher, 474 Mass. 1, 7 (2016) ("When the theory of extreme atrocity or cruelty is in play, an instruction on voluntary intoxication that links consideration of intoxication only to a defendant's intent or knowledge, without also explaining that the jury may consider

intoxication in relation to whether the defendant committed the killing with extreme atrocity or cruelty, is in error").

Because the jury also convicted the defendant on the theory of deliberation premeditation, however, the error did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Nolin, 448 Mass. 207, 220 (2007) ("If [the] jury return a guilty verdict based on two theories, the verdict will remain undisturbed even if only one theory is sustained on appeal").

d. Alleged juror misconduct. The defendant contends that the judge erred in declining to dismiss a juror accused of premature deliberation.

i. Allegation of premature deliberation. After alternate jurors were selected and the jury retired for deliberations, an alternate juror, juror no. 10, reported to the judge that a deliberating juror, juror no. 15, had made comments about the case a few days prior. Juror no. 10 reported that juror no. 15 commented that "the defense is not bringing up anybody" and asked other jurors how long the deliberations would take, stating that deliberations "shouldn't take that long." Additionally, juror no. 10 reported that juror no. 15 had stated, before the trial began and before the judge had instructed the jury, "I hate to do this to someone, but you have to do what you've got to do."

The judge then questioned all other jurors; each answered that no one had expressed any thoughts or comments about the substance of the case prior to deliberations.  When juror no. 15 was informed that the judge had received information that she may have commented about how long deliberations would take, juror no. 15 did not recall whether the comment had been made, but added, "I could have asked that because I don't know how long they take."  Juror no. 15 was also asked about forming opinions on the strength of the case prior to deliberations; juror no. 15 explained, "I don't feel like my mind was made up."

The judge denied the defendant's motion to dismiss juror no. 15, based on the lack of corroboration by other jurors and "concerns about the credibility and the motives" of juror no. 10, given the fact that juror no. 10 waited days to report the allegations, only disclosing them after being made an alternate, perhaps on the hope of becoming a deliberating juror.[24]  "[G]iven the lack of corroboration of any statements by any other fellow jurors, some of whom were alleged to have been present" when juror no. 15 was alleged to have made the statements, and juror no. 15's responses, the judge concluded, "I don't find misconduct, and I have substantial questions . . . about the bona fides of the report."  The judge excused juror no. 10.

---

[24] The prosecutor noted that juror no. 10 had been "visibly angry" after being selected as an alternate.

ii. <u>Analysis</u>. We review the judge's decision not to excuse juror no. 15 for abuse of discretion. See <u>Commonwealth</u> v. <u>Philbrook</u>, 475 Mass. 20, 31 (2016). "Prohibiting premature jury deliberations, and extraneous influences on jurors, safeguards a defendant's right to trial before an impartial jury." <u>Id</u>. at 30. "A judge's 'determination of a juror's impartiality is essentially one of credibility, and therefore largely one of demeanor,'" to which we give "great deference." <u>Id</u>., quoting <u>Commonwealth</u> v. <u>Alicea</u>, 464 Mass. 837, 849 (2013). "Jurors 'inevitably formulate impressions as they hear evidence. This is natural and cannot be prevented. . . . The question is whether jurors can suspend final judgment and keep their minds open to other evidence that they hear.'" <u>Philbrook</u>, <u>supra</u> at 31, quoting <u>Commonwealth</u> v. <u>Guisti</u>, 434 Mass. 245, 254 (2001), <u>S.C</u>., 449 Mass. 1018 (2007).

Here, the record is devoid of any basis to doubt the judge's findings, after questioning the jurors, that juror no. 10 was not credible, that there was no misconduct by juror no. 15, and that juror no. 15's statement about being able to keep an open mind should be credited.[25] See <u>Commonwealth</u> v. <u>Torres</u>,

---

[25] Juror no. 15 first explained, "I think everybody kind of forms an opinion as you're going along." As we explained in <u>Philbrook</u>, this is "natural and cannot be prevented"; it is acceptable so long as the juror keeps an open mind. <u>Philbrook</u>, 475 Mass. at 31, quoting <u>Guisti</u>, 434 Mass. at 254.

453 Mass. 722, 735 (2009) ("The judge was in the unique position to note the juror's demeanor, and nothing in the record leads us to conclude that his decision to retain her was clearly erroneous or an abuse of discretion").

e. Indictment charging attempted burning of a dwelling. The defendant maintains, for the first time, that the indictment charging the attempted burning of a dwelling should be dismissed because it failed to specify the crime charged and failed further to set forth the overt act constituting the alleged attempt. "In a criminal case," however, "any defense or objection based upon defects in the . . . indictment, other than a failure to show jurisdiction in the court or to charge an offense, shall only be raised prior to trial." G. L. c. 277, § 47A. The parties suggest that the argument is preserved because it pertains to the court's subject matter jurisdiction. See Commonwealth v. Nick N., 486 Mass. 696, 702 (2021), quoting Commonwealth v. DeJesus, 440 Mass. 147, 151 (2003) ("A question of subject matter jurisdiction 'may be raised at any time and is not waived even when not argued'" [alterations omitted]). This is not accurate.[26]

---

[26] In fairness to the parties, our case law has not always been consistent in describing the defect caused by the failure of an indictment to charge a crime. See Commonwealth v. Garrett, 473 Mass. 257, 264 (2015), citing Commonwealth v. Senior, 454 Mass. 12, 14 (2009) ("whether an indictment fails to allege an offense is a matter of jurisdiction, which may

Subject matter jurisdiction concerns the power of the court to entertain a particular category of case.  See Black's Law Dictionary 1017, 1020 (11th ed. 2019) (defining "jurisdiction" as "[a] court's power to decide a case or issue a decree" and "subject-matter jurisdiction" as "[j]urisdiction over the nature of the case and the type of relief sought"); Black's Law Dictionary 1425 (6th ed. 1990) (defining "[s]ubject matter jurisdiction" as "court's power to hear and determine cases of the general class or category to which proceedings in question belong; the power to deal with the general subject involved in the action").  See also J.W. Glannon, Civil Procedure:  Examples and Explanations 73 (2d ed. 1992) ("Subject matter jurisdiction . . . concerns the court's authority to hear generic types of cases.  All state court systems have a set of trial courts with

---

raised at any time"); Commonwealth v. Canty, 466 Mass. 535, 547 (2013), quoting Commonwealth v. Palladino, 358 Mass. 28, 31 (1970) ("No court has jurisdiction to sentence a defendant for that which is not a crime"); Commonwealth v. Cantres, 405 Mass. 238, 239-240 (1989), citing Commonwealth v. Andler, 247 Mass. 580, 581-582 (1924) ("if an indictment fails to state a crime, no court has jurisdiction to entertain it, . . . and the jurisdictional question may be raised at any time").  Rather than strip the court of subject matter jurisdiction, such an indictment violates constitutional principles, such as those secured by art. 12 of the Massachusetts Declaration of Rights. See Canty, supra at 546-547 (failure of indictment to charge crime violates defendant's "due process rights under art. 12 . . . , which provides that '[n]o subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him'"); Palladino, supra ("A conviction on an indictment that charges no crime would be sheer denial of due process").

very broad subject matter jurisdiction. These courts . . . have subject matter jurisdiction over a wide range of suits . . ."); A.B. Spencer, Civil Procedure: A Contemporary Approach 13 (5th ed. 2018) (subject matter jurisdiction addresses whether courts "have competency to hear a case, meaning they are authorized to adjudicate disputes of a particular kind").

The Superior Court has "original jurisdiction of all crimes." G. L. c. 212, § 6. The failure of an indictment charging the attempted burning of a dwelling to set forth the crime charged or an overt act does not strip the court of the power to hear the cause, let alone the category of criminal actions generally; in other words, a defect in an indictment has no bearing on the court's authority to hear a category of cases, here, all criminal cases.

Having clarified that a defect in an indictment is not a question concerning the subject matter jurisdiction of the court, we turn to the defendant's argument that the indictment failed to charge a crime because it did not specify that he was charged with an attempt to burn a "dwelling."[27] See G. L.

---

[27] The indictment stated:

"Wes Doughty, of Peabody, in the county of Essex, on or about February 18, 2017 at Peabody in the County of Essex aforesaid, did willfully and maliciously attempt to set fire to, or attempt to burn, or aid, counsel[,] or assist in such an attempt to set fire to or burn, or did commit any act preliminary thereto or in furtherance thereof,

c. 277, § 47A (challenge based on indictment's "failure to charge" crime preserved). Here, the indictment was captioned "Attempted Burning of a Dwelling" and cited "266/5A" (emphases added). Accordingly, the defendant's challenge fails because the caption together with the other words of the indictment identifies that the offense charged is a violation of G. L. c. 266, § 5A, which is a crime. See Commonwealth v. Canty, 466 Mass. 535, 548 (2013) (indictment provided "fair notice of the crime charged" "where the caption identified the criminal statute that was violated").

The defendant also challenges the indictment on the ground that the absence of an overt act from the indictment violates art. 12 of the Declaration of Rights of the Massachusetts Constitution. Passing over whether the defendant has waived any challenge based on this purported defect in the indictment, we conclude that the absence of an overt act from the attempted arson indictment, charging a violation of G. L. c. 266, § 5A, did not violate art. 12.

Article 12 provides that "[n]o subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him." The

against the peace of the Commonwealth aforesaid, and contrary to the form of the statute in such case made and provided."

defendant was charged with attempted burning of a dwelling in violation of G. L. c. 266, § 5A, which delineates the overt acts that "constitute an attempt":

> "[t]he placing or distributing of any flammable, explosive or combustible material or substance or any device in or against any building, structure[,] or property . . . in an arrangement or preparation with intent eventually to willfully and maliciously set fire to or burn such building, structure[,] or property, or to procure the setting fire to or burning of the same."

G. L. c. 266, § 5A. In view of the statute's express delineation of the overt acts, the indictment was not required to restate these overt acts.[28] "Provided there is fair notice of the crime charged, '[i]t is not necessary for the Commonwealth to set forth in the complaint or indictment every element of the crime . . . .'" Canty, 466 Mass. at 547, quoting Commonwealth

---

[28] The defendant was not charged under the general attempt statute, which provides: "Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration" shall be punished." G. L. c. 274, § 6. "We have . . . recognized that a 'charge of attempt [under the general attempt statute] should set forth in direct terms that the defendant attempted to commit the crime, and should allege the act or acts done toward its commission.'" Senior, 454 Mass. at 15 n.3, quoting Commonwealth v. Gosselin, 365 Mass. 116, 121 (1974). Thus, we have held that an indictment under the general attempt statute, G. L. c. 274, § 6, must "allege the act or acts done toward its commission"; "[o]vert acts not alleged may not be relied on." Gosselin, supra, citing Commonwealth v. Peaslee, 177 Mass. 267, 274 (1901). But see Commonwealth v. Lourenco, 438 Mass. 1018, 1019 (2003) (question "whether the overt act requirement remains valid to describe fully and plainly the charge of attempt to the defendant, or if it reflects an anachronistic view of sufficient indictments and complaints").

v. <u>Fernandes</u>, 430 Mass. 517, 520 (1999), cert. denied sub nom. <u>Martinez</u> v. <u>Massachusetts</u>, 530 U.S. 1281 (2000).  See <u>Canty</u>, <u>supra</u> at 548 ("the absence of a required element in an indictment does not by itself establish that a crime is not charged, even if acquittal is required if the prosecution were to prove only the allegations in the indictment").  See also G. L. c. 277, § 34 ("An indictment shall not be dismissed or be considered defective or insufficient if it is sufficient to enable the defendant to understand the charge and to prepare his defense; nor shall it be considered defective or insufficient for lack of any description or information which might be obtained by requiring a bill of particulars").  As such, the defendant's challenge to the indictment has no merit.[29]

f. <u>Review under G. L. c. 278, § 33E</u>.  After review of the entire record, we discern no error warranting relief under G. L. c. 278, § 33E.

<u>Judgments affirmed</u>.

---

[29] The defendant also maintains that the indictment is defective because it failed to list the particular dwelling in question; this argument also fails.  The defendant did not ask for a bill of particulars, which could have provided him with the address of the dwelling.  See G. L. c. 277, § 34.  Moreover, he was provided with the grand jury minutes, which identified the specific dwelling alleged to have been the subject of the attempted arson.